United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 8, 2005**

Charles R. Fulbruge III
Clerk

**REVISED MARCH 16, 2005**
**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-31026

TRAVIS PACE,

Plaintiff-Appellant,

VERSUS

THE BOGALUSA CITY SCHOOL BOARD, LOUISIANA STATE BOARD OF
ELEMENTARY AND SECONDARY EDUCATION, THE LOUISIANA DEPARTMENT
OF EDUCATION, and THE STATE OF LOUISIANA,

Defendants-Appellees.

Appeal from the United States District Court
For the Eastern District of Louisiana

Before KING, Chief Judge, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS and PRADO, Circuit Judges.[1]

DAVIS and WIENER, Circuit Judges:

Travis Pace (Pace) appeals the district court's dismissal of his claim under the Individuals with Disabilities Education Act (IDEA) and the district court's order granting summary judgment in favor of defendants on Pace's claims under Title II of the Americans with Disabilities Act (ADA or Title II) and § 504 of the

_____

[1] Judge Clement recused herself and did not participate in this decision.

Rehabilitation Act (§ 504). The panel of this court which considered Pace's appeal concluded that the State of Louisiana, the Louisiana Department of Education and the Louisiana State Board of Elementary and Secondary Education (State Defendants) were entitled to sovereign immunity under the Eleventh Amendment from all of Pace's claims. The panel then affirmed the district court's dismissal of Pace's claims against the Bogalusa City School Board. We took this case en banc, first to consider whether the state defendants were entitled to immunity from Pace's claims under the Eleventh Amendment and, second, to consider the merits of Pace's claims under the IDEA, ADA and § 504. For the reasons discussed below, we now conclude that the State waived its right to immunity under the Eleventh Amendment and therefore the State defendants are not entitled to immunity from Pace's § 504 and IDEA claims. On the merits, we conclude that the district court did not err in dismissing Pace's IDEA claims and that the district court correctly concluded that the dismissal of Pace's IDEA claims precluded his inaccessibility claims under the ADA and § 504. We reject Pace's argument that because different legal standards control his inaccessibility claims under ADA/504, those claims were not litigated in his IDEA action. A 1997 amendment and implementing regulations to the IDEA expressly require schools to comply with the identical standards for new construction that ADA/504 and their regulations require.

## I. FACTUAL AND LEGAL BACKGROUND

The factual and procedural background of this case is accurately and succinctly presented in the panel opinion:

In 1994, at the age of fifteen, Travis Pace (Pace) was enrolled at Bogalusa High School. He is developmentally delayed, confined to a wheelchair, and suffers from cerebral palsy and bladder incontinence. In July 1997, Pace's mother requested a due process hearing under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, et seq., as she believed that Pace was denied a "free appropriate public education" (FAPE) due to a lack of handicap accessible facilities at Bogalusa High School and deficiencies in Pace's "individualized education programs" (IEPs). The hearing officer found that the Bogalusa City Schools System[2] provided Pace with a FAPE in compliance with the IDEA, and the State Level Review Panel (SLRP) affirmed the hearing officer's decision.

In September 1997, Pace filed a complaint with the Office for Civil Rights of the Department of Education (OCR), alleging violations of § 504 of the Rehabilitation Act (§ 504), 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132. The OCR and BCSB resolved allegations that the BCSB operated services, programs, and activities that were physically inaccessible to or unusable by individuals with disabilities by entering into a voluntary written agreement under which the BCSB would identify accessibility barriers and the OCR would oversee the development of a compliance plan.

In March 1999, Pace filed suit in federal district court, seeking damages and injunctive relief against the BCSB, the Louisiana State Board of Elementary and Secondary Education, the Louisiana Department of Education, and the State of Louisiana, alleging violations of the IDEA, the ADA, § 504 of the Rehabilitation Act, 42 U.S.C. § 1983, and various state

---

[2] The hearing examiner made hearings with regard to the Bogalusa City Schools System. In federal court, Pace brought suit against the Bogalusa City School Board. For all practical purposes, these two entities are the same and will be referred to as "BCSB."

statutes.[3] The district court bifurcated Pace's IDEA and non-IDEA claims. In separate orders, it affirmed the SLRP decision by dismissing Pace's IDEA claims, then granted the defendants' motions for summary judgment on Pace's non-IDEA claims. Pace appeals both decisions.

## II. STATE IMMUNITY UNDER THE ELEVENTH AMENDMENT

We consider first the defendants' arguments that they are entitled to sovereign immunity from Pace's claims under the Eleventh Amendment. At the core of this Eleventh Amendment dispute is the question whether, when Louisiana accepted particular federal funds, it waived the immunity afforded it by the Eleventh Amendment to suits under § 504 and the IDEA.[4]

A. THE TEXT AND FUNCTION OF THE ELEVENTH AMENDMENT

We start, as always, with the text. The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.[5]

These forty-three words — adopted in swift response to the Supreme

---

[3] We do not consider Pace's § 1983 claim and state law claims because he did not brief them on appeal. L & A Contracting Co. v. S. Concrete Servs., Inc., 17 F.3d 106, 113 (5th Cir. 1994); F.R.A.P. 28(a)(9)(A).

[4] The waiver argument does not apply to Title II because the ADA does not condition the receipt of federal funds on compliance with the Act or waiver of Eleventh Amendment immunity. Rather, Title II applies to public entities regardless of whether they receive federal funds. See 42 U.S.C. § 12132.

[5] U.S. CONST. amend. XI.

-4-

Court's holding in <u>Chisholm v. Georgia</u>[6] that Article III permitted a state to be sued in federal court[7] —— protect states from such litigation.[8]  The protection thus afforded, however, has long since been expanded beyond the plain text of the Amendment.  "Though its precise terms bar only federal jurisdiction over suits brought against one State by citizens of another State or foreign state," the Supreme Court's interpretation of the Amendment has "recognized that the Eleventh Amendment accomplished much more."[9]  The immunity afforded to states under the Eleventh Amendment "implicates the fundamental constitutional balance between the Federal Government and the States."[10]  Therefore, at its core, the Eleventh Amendment serves "as an essential component of our constitutional structure."[11]

Nevertheless, Eleventh Amendment immunity is not absolute.  A number of different circumstances may lead to a state's litigating

---

[6] 2 U.S. (2 Dall.) 419 (1793).

[7] See <u>United States ex rel. Foulds v. Texas Tech Univ.</u>, 171 F.3d 279, 286 n.9 (5th Cir. 1999) ("The Supreme Court's interpretation of Article III powers in <u>Chisholm</u>, prompted Congress' 'outraged reversal' of that decision through enactment of the Eleventh Amendment.") (citing DAVID P. CURRIE, THE CONSTITUTION IN THE SUPREME COURT: THE FIRST HUNDRED YEARS 99 (1985)).

[8] For present purposes, we ignore any role the Eleventh Amendment plays in regulating whether states may be sued in state courts.

[9] <u>College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 669 (1999).

[10] <u>Atascadero State Hosp. v. Scanlon</u>, 473 U.S. 234, 238 (1985).

[11] <u>Dellmuth v. Muth</u>, 491 U.S. 223, 228 (1989).

in federal court absent Eleventh Amendment immunity. We begin with an overview of the Court's current framework for assessing when a suit against a state may proceed in federal court.

B. EXCEPTIONS TO ELEVENTH AMENDMENT IMMUNITY

There are two fundamental exceptions to the general rule that bars an action in federal court filed by an individual against a state. First, a state's Eleventh Amendment immunity may be abrogated when Congress acts under § 5, the Enforcement Clause of the Fourteenth Amendment.[12] Second, a state may consent to suit in federal court.[13]

### 1. Abrogation under § 5 of the Fourteenth Amendment

Congress can single-handedly strip the states of their Eleventh Amendment immunity and thereby authorize federal court suits by individuals against the states. When Congress does this, it is exercising its power to abrogate Eleventh Amendment immunity. In Reickenbacker v. Foster,[14] we examined the Supreme Court's cases

---

[12] U.S. CONST. amend. XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.").

[13] The term "abrogation" is not synonymous with "consent" or "waiver." When a state consents to suit or waives its Eleventh Amendment immunity, it knowingly and voluntarily forfeits the immunity's protections. In contrast, when Congress acts under its Fourteenth Amendment power to abrogate, the state has no choice.

[14] 274 F.3d 974 (5th Cir. 2001). The continuing validity of Reickenbacker following the Supreme Court's decision in Tennessee v. Lane, 124 S. Ct. 1978 (2004), is uncertain. At the very least, its holding has been overruled as to Title II claims implicating a person's fundamental right of access to the courts. In addition, after Lane we do not look solely at the state level for a history and pattern of unconstitutional action; we also examine discrimination by nonstate government entities.

concerning congressional abrogation of Eleventh Amendment immunity under § 5 of the Fourteenth Amendment and derived the following test for determining whether a federal statute is a valid exercise of Congress's power to enforce the Fourteenth Amendment and, consequently, whether the statute abrogates Eleventh Amendment immunity: (1) The statute must contain an unequivocal statement of congressional intent to abrogate; (2) Congress must have identified a history and pattern of unconstitutional action by the states; and (3) the rights and remedies created by the statute must be congruent and proportional to the constitutional violation(s) Congress sought to remedy or prevent.[15] If these three requirements are satisfied, states are subject to federal jurisdiction in suits under the statute adopted pursuant to § 5, regardless of any absence of consent.

## 2. Waiver of Immunity by Consent

Either in the absence of § 5 abrogation or in addition to it, a state always has the prerogative of foregoing its protection from federal court jurisdiction under the Eleventh Amendment.[16] A

---

Lane, 124 S. Ct. at 1991 n.16.

[15] Id. at 977, 981-83.

[16] College Savings Bank, 527 U.S. at 670; Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997) ("[A] State can waive its Eleventh Amendment protection and allow a federal court to hear and decide a case commenced or prosecuted against it."); Great N. Life Ins. Co. v. Read, 322 U.S. 47, 54 (1944) ("The immunity may, of course, be waived."); Clark v. Barnard, 108 U.S. 436, 447 (1883) ("The immunity from suit belonging to a State, which is respected and protected by the Constitution within the limits of the judicial power of the United States, is a personal privilege which it may waive at pleasure.").

state's consent to suit must be both <u>knowing</u> and <u>voluntary</u>. That consent must always be "knowing and voluntary" follows from <u>College Savings Bank</u>, in which the Supreme Court cited <u>Johnson v. Zerbst</u>, to define what constitutes effective waiver.[17] Waiver is effective when it is the "intentional relinquishment or abandonment of a known right or privilege."[18] The first part, "intentional relinquishment," captures the principle of <u>voluntariness</u>; and the second part, "known right or privilege," captures the element of <u>knowingness</u>.

When Congress conditions the availability of federal funds on a state's waiver of its Eleventh Amendment immunity, we employ a five-prong test derived from the Supreme Court's definitive spending power case, <u>South Dakota v. Dole</u>,[19] to ascertain the validity of the waiver. In <u>Dole</u>, South Dakota challenged a congressional statute that conditions the states' receipt of federal highway funds on their adoption of the minimum drinking age of twenty-one. South Dakota argued that the statute exceeded Congress's spending power and violated the Twenty-First Amendment.[20] The Court rejected this argument, noting that even though Congress is prohibited by the Twenty-First Amendment from directly

---

[17] 527 U.S. at 682 (citing <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938)).

[18] <u>Id.</u> (quoting <u>Zerbst</u>, 304 U.S. at 464)

[19] 483 U.S. 203 (1987).

[20] <u>Id.</u> at 205.

-8-

regulating the distribution of alcoholic beverages, the Spending Clause authorizes it indirectly to entice states to raise their drinking age by dangling the proverbial carrot of federal dollars.[21]

Dole embodies an expansive interpretation of Congress's spending authority. Indirect persuasion is constitutional, reasoned the Court, because the spending power "is not limited by the direct grants of legislative power found in the Constitution."[22] Congress can, therefore, validly use its spending power to legislate conditions on the disbursement of federal funds even though those conditions would be unconstitutional if enacted as direct prohibitions.[23] It goes without saying that, because states have the independent power to lay and collect taxes, they retain the ability to avoid the imposition of unwanted federal regulation simply by rejecting federal funds.

Nevertheless, Congress's power to effect policy through the exercise of its spending power is not unlimited. Dole announced

---

[21] Id. at 206. See also New York v. United States, 505 U.S. 144, 161-69 (1992) (holding that although the Tenth Amendment prevents Congress from directly commandeering state officials into regulating radioactive waste, Congress can "hold out incentives to the States as a method of influencing a State's policy choices").

[22] Dole, 483 U.S. at 207 (quoting United States v. Butler, 297 U.S. 1, 66 (1936)). See also United States v. Lipscomb, 299 F.3d 303, 319 (5th Cir. 2002) ("Congress's spending power, like its power to tax, is 'to provide for the general welfare,' and is therefore untrammeled by the specific grants of legislative power found elsewhere in Article I, Section 8.") (citation omitted).

[23] See Dole, 483 U.S. at 206-07; United States v. Am. Library Ass'n, Inc., 539 U.S. 194, 203 (2003) ("Congress has wide latitude to attach conditions to the receipt of federal assistance in order to further its policy objectives.").

the restrictions that control such exercise: (1) Federal expenditures must benefit the general welfare; (2) The conditions imposed on the recipients must be unambiguous; (3) The conditions must be reasonably related to the purpose of the expenditure; and (4) No condition may violate any independent constitutional prohibition.[24] In addition, the Dole Court recognized a fifth requirement that the condition not be coercive: "[I]n some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'"[25]

Thus, Dole makes clear that, as long as its framework is employed, congressional spending programs that are enacted in pursuit of the general welfare and unambiguously condition a state's acceptance of federal funds on reasonably related requirements are constitutional unless they are either (1) independently prohibited or (2) coercive. When the condition requires a state to waive its Eleventh Amendment immunity, Dole's requirement of an unambiguous statement of the condition and its proscription on coercive inducements serve a dual role because they ensure compliance with College Savings Bank's requirement that waiver of Eleventh Amendment immunity must be (a) knowing and (b) voluntary.

---

[24] Id. at 207-08. See also New York, 505 U.S. at 171-72.

[25] 483 U.S. at 211 (quoting Steward Machine Co. v. Davis, 301 U.S. 548, 590 (1937)).

### i.   Clear Statement: "Knowing"

In <u>Pennhurst State Sch. & Hosp. v. Halderman</u>,[26] the Court analyzed Congress's power to impose conditions on a state's receipt of federal funds and pronounced:

> There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.... <u>By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly</u>, cognizant of the consequences of their participation.[27]

Thus, we know that this stringent clear-statement rule ensures that when a state foregoes its Eleventh Amendment immunity in exchange for federal funds, it does so "knowingly."[28]  In our reading of <u>Pennhurst</u>, the only "knowledge" that the Court is concerned about is a state's knowledge that a Spending Clause condition requires waiver of immunity, <u>not</u> a state's knowledge that it has immunity that it could assert.  At bottom, we conclude that if Congress satisfies the clear-statement rule, the knowledge prong of the Spending Clause waiver analysis is fulfilled.

### ii.   Non-Coercive: "Voluntary"

If the clear-statement rule is satisfied, a state's actual acceptance of clearly conditioned funds is generally voluntary.

---

[26] 451 U.S. 1 (1981).

[27] <u>Id.</u> at 17 (emphasis added) (citations omitted).

[28] <u>See</u> <u>also</u> <u>Dole</u>, 483 U.S. at 207.

The only exception to this presumption arises if the spending program itself is deemed "coercive," for then a state's waiver is, by definition, no longer voluntary.

In summary, the Supreme Court has articulated two ways that a state can be subject to an individual's suit in federal court, regardless of the Eleventh Amendment. First, Congress may abrogate state immunity. Second, the state may waive its Eleventh Amendment immunity by consent. If waiver results from participation in a Spending Clause program, the program must be a valid exercise of Congress's spending power; the waiver condition must satisfy the clear-statement rule (thereby ensuring that the state's waiver is "knowing"); and the program must be non-coercive (automatically establishing that the waiver is "voluntary").

C. WAIVER OF ELEVENTH AMENDMENT IMMUNITY PURSUANT TO CONDITIONAL SPENDING PROGRAMS

Keeping firmly in mind the Court's current framework for analyzing when a state may be subject to suit in federal court, we turn to the particular facts and legal contentions of the instant case. The two statutory provisions at issue purport to have conditioned Louisiana's receipt of federal funds on its waiver of Eleventh Amendment immunity to suits under § 504 and the IDEA. Specifically, 42 U.S.C. § 2000d-7 conditions a state's receipt of federal money on its waiver of Eleventh Amendment immunity to actions under § 504 and other federal anti-discrimination statutes:

A State shall not be immune under the Eleventh

-12-

Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.[29]

Similarly, 20 U.S.C. § 1403[30] conditions a state's receipt of federal IDEA funds on its consent to suit under that Act.[31] Applying the framework set forth in Dole, we proceed to determine whether Louisiana validly waived its immunity when it accepted the conditioned federal dollars.

Louisiana does not dispute that the first and third prongs of the Dole analysis, i.e., whether the Spending Clause statute at issue was enacted in pursuit of the general welfare, and whether the condition is sufficiently related to the federal interest in

---

[29] 42 U.S.C. § 2000d-7(a)(1). Congress enacted § 2000d-7 in response to Atascadero, in which the Court held that the Rehabilitation Act neither abrogated Eleventh Amendment immunity nor effectively conditioned states' receipt of federal funds on a waiver of that immunity. Atascadero, 473 U.S. at 245-47. According to the Court, the statute did not contai n a clear statement of congressional intent either to abrogate or to require a waiver. Id.

[30] 20 U.S.C. § 1403(a) reads as follows: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter."

[31] The section was passed by Congress in response to Dellmuth v. Muth, 491 U.S. 223 (1989). In Dellmuth, the Supreme Court held that the predecessor to the IDEA (the Education of the Handicapped Act) lacked a sufficiently clear statement of Congressional intent to abrogate Eleventh Amendment immunity to claims under the statute. Id. at 232. The conditional-spending issue was not raised in the case.

-13-

the program funded,[32] are satisfied here.  Consequently, we restrict our consideration to the three remaining prongs of the <u>Dole</u> test. Following prior panels of this court,[33] and every circuit (but one) that has made these inquiries, we conclude that the statutes at issue validly conditioned Louisiana's receipt of these federal funds on its waiver of Eleventh Amendment immunity.[34]

---

[32] In its en banc brief, Louisiana mentioned a relatedness challenge to § 2000d-7, but that argument was not presented to the panel, and Louisiana's en banc brief fails to develop it beyond a bare assertion.  Thus, Louisiana has waived its relatedness challenge.  See L & A Contracting Co. v. S. Concrete Servs., Inc., 17 F.3d 106, 113 (5th Cir. 1994); FED. R. APP. P. 28(a)(9)(A); cf. Koslow v. Pennsylvania, 302 F.3d 161, 175-76 (3d Cir. 2002) (rejecting a relatedness challenge to the validity of a state's conditional-spending waiver of immunity to § 504 suits).

[33] E.g., Pederson v. Louisiana State Univ., 213 F.3d 858, 876 (5th Cir. 2000) ("A state may waive its immunity by voluntarily participating in federal spending programs when Congress expresses a clear intent to condition participation in the programs ... on a State's consent to waive its constitutional immunity.") (citation and quotation marks omitted); id. at 875 (holding that "in enacting § 2000d-7 Congress permissibly conditioned a state university's receipt of [federal] funds on an unambiguous waiver of the university's Eleventh Amendment immunity, and that, in accepting such funding, the university has consented to litigate private suits in federal court.") (internal punctuation and citation omitted) (emphasis added). Cf. AT&T Comm. v. BellSouth Telecom. Inc., 238 F.3d 636, 645 (5th Cir.), reh'g en banc denied, 252 F.3d 437 (2001) ("[A]fter College Savings, Congress may still obtain a non-verbal voluntary waiver of a state's Eleventh Amendment immunity, if the waiver can be inferred from the state's conduct in accepting a gratuity after being given clear and unambiguous statutory notice that it was conditioned on waiver of immunity.").

[34] Eight circuits have reached this conclusion in § 504 cases. See Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 129-30 (1st Cir. 2003); A.W. v. Jersey City Pub. Schs., 341 F.3d 234, 244-51 (3d Cir. 2003); Bruggeman v. Blagojevich, 324 F.3d 906, 912 (7th Cir. 2003); Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1292-93 (11th Cir. 2003) (per curiam); Lovell v. Chandler, 303 F.3d 1039, 1051-52 (9th Cir. 2002); Koslow, 302 F.3d at 172 (3d Cir.); Robinson v. Kansas, 295 F.3d 1183, 1189-90 (10th Cir. 2002); Nihiser v. Ohio E.P.A., 269 F.3d 626, 628 (6th Cir. 2001); Jim C. v. Arkansas Dep't of Educ., 235 F.3d 1079, 1081 (8th Cir. 2000) (en banc); Stanley v. Litscher, 213 F.3d 340, 344 (7th Cir. 2000).  Other courts of appeals have reached the same conclusion for the other predicate statutes of § 2000d-7.  See, e.g., Cherry v. Univ. of Wis. Sys. Bd. of Regents, 265 F.3d 541, 553-55 (7th Cir. 2001) (Title IX); Sandoval v. Hagan, 197 F.3d 484 (11th Cir. 1999) (Title VI), rev'd in part on other grounds, 532 U.S. 275 (2001); Litman v. George Mason Univ., 186 F.3d 544

-14-

First, we determine whether the conditions contained in 42 U.S.C. § 2000d-7 and 20 U.S.C. § 1403 are unambiguous and, consequently, whether Louisiana knowingly waived its immunity to actions under § 504 and the IDEA by accepting federal funds.

### 1. Is the Clear-Statement Rule Satisfied Absent Use of the Words "Waiver" or "Condition"?

In the face of the unequivocal language of § 2000d-7 to the effect that "[a] state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of § 504 of the Rehabilitation Act of 1973,"[35] Louisiana argues legalistically that, because Congress did not use the words "waiver" or "condition," the condition fails the clear-statement rule.[36] This argument — that absent talismanic incantations of magic words, there can be no waiver — is little more than frivolous.[37] The Supreme Court has already noted, albeit in dicta, that in § 2000d-7 "Congress sought to provide the sort of unequivocal waiver that our precedents demand."[38] More importantly,

---

(4th Cir. 1999) (Title IX). Circuits have reached this conclusion about the IDEA, as well. See, e.g., M.A. ex rel. E.S. v. State-Operated School Dist., 344 F.3d 335, 351 (3d Cir. 2003); Oak Park Bd. of Educ. v. Kelly E., 207 F.3d 931, 935 (7th Cir. 2000).

[35] 42 U.S.C. § 2000d-7 (2000).

[36] In its amicus brief, the State of Texas points to other statutes that have used such terms.

[37] Cf. Woods v. Cloyd W. Miller Co., 333 U.S. 138, 144 (1948) ("The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.").

[38] Lane v. Pena, 518 U.S. 187, 198 (1996). See also id. at 200 (noting "the care with which Congress responded to ... Atascadero by crafting an unambiguous waiver of the States' Eleventh

-15-

our decision in <u>Pederson v. Louisiana State University</u>, which we remain convinced was correctly decided, forecloses this line of attack.[39]

## 2. Does the Presence of Abrogation Language Preclude a Finding of Waiver?

Louisiana also argues that because § 2000d-7 and § 1403 fail as § 5 attempts by Congress to <u>abrogate</u> Eleventh Amendment immunity, the same provisions of those statutes cannot satisfy the clear-statement rule for Spending Clause purposes. We reject Louisiana's attempt to pigeonhole this statutory language in mutually exclusive terms.

We held in <u>Pederson</u> that, in § 2000d-7, Congress "successfully codified a statute which clearly, unambiguously, and unequivocally conditions receipt of federal funds under Title IX on the State's waiver of Eleventh Amendment Immunity."[40] And in <u>Lesage v. Texas</u>,[41] we ruled that "Congress unquestionably enacted 42 U.S.C. § 2000d-7 with the 'intent' to invoke the Fourteenth Amendment's congressional enforcement power. The purpose of the provision, enacted in 1986, was to legislatively overrule the result in

---

Amendment immunity").

[39] 213 F.3d at 875-76 (adopting the holding and reasoning of <u>Litman v. George Mason Univ.</u>, 186 F.3d 544 (4th Cir. 1999)).

[40] 213 F.3d at 876.

[41] 158 F.3d 213 (5th Cir. 1998), <u>overruled on other grounds</u>, 528 U.S. 18 (1999).

<u>Atascadero</u>."[42] Thus, in <u>Pederson</u>, we recognized § 2000d-7 as a clear statement for <u>waiver</u> vis-à-vis the Spending Clause, and in <u>Lesage</u>, we recognized that the very same provision could satisfy <u>abrogation</u> under § 5 of the Fourteenth Amendment.

Just because particular language may or may not function with equal efficacy under both exceptions to Eleventh Amendment immunity, does not mean that it fails the clear-statement rule. As we concluded in <u>AT&T</u>, the rule requires only that "the state has been put on notice clearly and unambiguously by the federal statute that the state's particular conduct or transaction will subject it to federal court suits brought by individuals."[43] Congress need not declare in the statute whether it is proceeding under abrogation or waiver, or both. For the purpose of the clear-statement rule, § 2000d-7 — janus-faced as it may be — poses no constitutional impediment to our finding valid waiver by consent. We conclude that the conditions contained in § 2000d-7 and § 1403 are unambiguous, as required by <u>Dole</u>.

Undaunted, Louisiana still contends that it did not knowingly waive its Eleventh Amendment immunity. Louisiana and the dissent rely on <u>Garcia v. S.U.N.Y. Health Sciences Ctr.</u>,[44] which looked to

---

[42] Id. at 218. See also United States v. Wells, 519 U.S. 482, 495 (1997) (reiterating the baseline presumption that Congress expects its statutes to be read in conformity with the Supreme Court's precedents).

[43] 238 F.3d at 644.

[44] 280 F.3d 98 (2d Cir. 2001).

the Supreme Court's decision in <u>Board of Trustees of the University of Alabama v. Garrett</u>[45] to justify departing from the heavy weight of authority supporting waiver based on the clarity of the language in § 2000d-7. <u>Garrett</u> examined whether, in Title I of the ADA, Congress could constitutionally abrogate the states' Eleventh Amendment immunity.[46] The <u>Garrett</u> Court concluded that Title I of the ADA was outside the scope of valid § 5 legislation; therefore, Congress's attempt at abrogation failed, and private suits against states in federal court were barred by the Eleventh Amendment.[47]

The lawsuits in <u>Garcia</u> involved disputes that arose between September 1993 and August 1995.[48] During that pre-<u>Garrett</u> period, it was universally accepted that the ADA validly abrogated Eleventh Amendment immunity. Rather than looking at the clear-statement rule and the state's acceptance of funds, <u>Garcia</u> analyzed whether a state would have realized —— "known" —— that it was abandoning its Eleventh Amendment immunity by accepting federal funds during the period of time applicable to the lawsuits at issue there (and here).[49] The <u>Garcia</u> court noted that, during the relevant period, "Title II of the ADA was reasonably understood to abrogate [the

---

[45] 531 U.S. 356 (2001).

[46] See <u>id.</u> at 365-74.

[47] <u>Id.</u> at 374.

[48] <u>Garcia</u>, 280 F.3d at 114 n.4.

[49] <u>Id.</u> at 114.

state's] sovereign immunity under Congress's Commerce Clause authority."[50]  The court also pointed out that the requirements of Title II and § 504 are "virtually identical."[51]  Therefore, concluded the court, because the state defendant thought that it could be sued under Title II, it had nothing to lose by accepting federal funds and redundantly waiving immunity to § 504 suits in the process.[52]

Louisiana and the dissent maintain that we should follow the panel and apply the "logic" of Garcia to the instant case.  First, Louisiana contends that, because it "believed" that the Rehabilitation Act had already abrogated its Eleventh Amendment immunity, it "did not and could not know that [it] retained any sovereign immunity to waive by accepting conditioned federal funds."[53]  Likewise, Louisiana asks us to conclude that § 1403 was an unsuccessful attempt at abrogation; therefore, maintains Louisiana, it could not have "knowingly" waived its immunity under the IDEA when it accepted federal IDEA funds.

Even though it found that the statutory provisions at issue are unambiguous,[54] the panel nevertheless concluded that Louisiana's

---

[50] Id.

[51] Id.

[52] Id.

[53] Pace, 325 F.3d at 616.

[54] Pace, 325 F.3d at 615.

purported waivers of Eleventh Amendment immunity are invalid because they were not knowing. The panel drew support from the holding in Garcia, but its reasoning differed slightly from the Second Circuit's. According to the panel opinion, "[b]elieving that [the Rehabilitation Act and the IDEA] validly abrogated their sovereign immunity, the State defendants did not and could not know that they retained any sovereign immunity to waive by accepting conditioned federal funds."[55]

The fatal flaw with that syllogism lies in the fact that neither the mandates of the Rehabilitation Act nor the requirements of the IDEA apply to a state agency that has not received either some federal funding (in the case of the Rehabilitation Act) or federal IDEA dollars (in the case of the IDEA).[56] Therefore, it is impossible for Congress to have "abrogated" a state's immunity to § 504 or IDEA suits if the relevant state agency did not receive federal funds during the time period in which it was alleged to have violated an individual's statutory rights. It follows indisputably that Louisiana's Eleventh Amendment immunity to § 504 and IDEA claims was intact before the state accepted federal funds. Thus, Louisiana did have Eleventh Amendment immunity to waive by accepting the clearly conditioned federal funds.

---

[55] Pace, 325 F.3d at 616.

[56] See 29 U.S.C. § 794(a) (pro hibiting discrimination against the disabled through "any program or activity receiving Federal financial assistance"); 20 U.S.C. §§ 1412, 1415 (conditioning state agencies' receipt of federal funds on compliance with the requirements of the IDEA).

The dissent nevertheless insists that, during the time that § 504 and the IDEA were thought to abrogate Eleventh Amendment immunity, Louisiana could have believed that it lacked immunity to § 504 and IDEA suits even before it received federal funds under those statutes.[57] This ignores the conditional-spending nature of the Rehabilitation Act and the IDEA. The Acts' substantive provisions regulate only state agencies that have accepted the relevant federal funds. Thus, it makes no sense to say that the State was subject to private actions for damages under § 504 and the IDEA before the substantive provisions of those statutes applied to it. Contrary to the dissent's accusation,[58] we do not confuse the doctrines of abrogation and waiver; rather, we point out that — even before Garrett — Louisiana could have avoided suits under § 504 and the IDEA altogether by declining federal funding. Louisiana clearly had Eleventh Amendment immunity to waive at the time that it accepted the federal funds and expressly obligated itself to comply with the dictates of the Rehabilitation Act and the IDEA.

Further, during the relevant time period, §§ 2000d-7 and 1403 put each state on notice that, by accepting federal money, it was

_____

[57] Post at 9 ("[T]he State acted quite rationally in assuming between 1996 and 1998 that it had no sovereign immunity to waive when it accepted federal education funds under conditions specified by § 504 and IDEA.").

[58] Post at 10 & n.7.

-21-

waiving its Eleventh Amendment immunity. Under <u>Dole</u>, if the clear-statement requirement is met, the state is conclusively presumed to have "known" that receipt of clearly conditioned federal funds requires the state to abide by the condition (i.e., waiver of Eleventh Amendment immunity).

In addition, the <u>Garcia</u> approach is problematic for a number of reasons, the most fundamental of which is that, by focusing its inquiry on what the state could have believed, the Second Circuit engrafted a subjective-intent element onto the otherwise objective Spending Clause waiver inquiry. In other words, <u>Garcia</u>'s approach employs the wrong jurisprudential test, because it distorts what is necessary to show knowledge for Spending Clause waivers. Analytically, the "knowledge" question that we ask when we undertake the Spending Clause waiver inquiry is coextensive with the clear-statement rule; for, when a state <u>actually</u> accepts funds that are clearly conditioned on a waiver of Eleventh Amendment immunity, it is held objectively to "know" that it is accepting <u>all</u> clearly stated conditions. That it might not "know" subjectively whether it had any immunity to waive by agreeing to those conditions is wholly irrelevant.

The dissent asserts that, by focusing on the clear-statement requirement, we have disregarded <u>College Savings Bank</u>'s "clear declaration" requirement. But <u>College Savings Bank</u> was not a conditional-spending case. There, the Court invalidated "constructive waivers" of Eleventh Amendment immunity "based upon

-22-

the State's mere presence in a field subject to congressional regulation."[59] Such a constructive waiver is a far cry from a state's acceptance of federal funds that are explicitly conditioned on its waiver of Eleventh Amendment immunity. In fact, the College Savings Bank opinion expressly distinguished conditional-spending waivers of Eleventh Amendment immunity, which it said were "fundamentally different from" illegitimate constructive waivers.[60] Nothing in College Savings Bank indicates that, when the clear-statement requirement is met, a state can be said to lack knowledge that by accepting federal funds it waives its Eleventh Amendment immunity.

In sum, Garcia and the dissent would subjugate the bright-line of objective reasoning to the slippery slope of assessing a state's subjective belief.[61] If, like the panel, we were to follow that approach, we would be getting into the business of looking past the straightforward objective facts, i.e., (1) the clear statement requiring waiver and (2) the state's actual, uncoerced acceptance of federal funds, in an attempt to fathom what was in a state's "head," a precarious exercise indeed. The clear-statement rule guards against post hoc questions about intent.

---

[59] College Savings Bank, 527 U.S. at 680.

[60] Id. at 686.

[61] See Lapides v. Bd. of Regents, 535 U.S. 613, 621 (2002) ("Motives are difficult to evaluate, while jurisdictional rules should be clear.").

Accordingly, we hold that Louisiana's waiver of Eleventh Amendment immunity to actions under § 504 and the IDEA was knowing.[62]  Still, we must determine whether an independent constitutional bar prevents Congress from conditioning the receipt of federal funds on a state's waiver of Eleventh Amendment immunity.

### 3. Can Congress Condition Waiver of Eleventh Amendment Immunity When It Exercises its Spending Power?

Louisiana challenges Congress's power under the Spending Clause to condition receipt of federal education funds on a state's waiver of Eleventh Amendment immunity.  This position is frivolous.  We have consistently interpreted Supreme Court guidance as permitting such conditional spending programs, as has every other circuit that has squarely addressed the issue.[63]  We do not change course today.

---

[62] Since the Pace panel opinion was issued, five circuits have expressly rejected its approach, which the dissent continues to advocate.  See Nieves-Márquez, 353 F.3d at 129-30 (First Circuit); A.W., 341 F.3d at 244-52 (Third Circuit); Shepard v. Irving, 77 Fed. Appx. 615, 619 n.2 (4th Cir. 2003) (unpublished); Doe v. Nebraska, 345 F.3d 593, 600-604 (8th Cir. 2003); Garrett, 344 F.3d at 1292-93 (Eleventh Circuit). See also Koslow, 302 F.3d at 172 n.12 (explaining that "the 'clear intent to condition participation in the programs funded,' required by Atascadero, 473 U.S. at 247, ensured the Commonwealth of Pennsylvania knew that by accepting certain funds under the Rehabilitation Act for certain departments or agencies, it waived immunity from suit on Rehabilitation Act claims for those entities").

[63] See, e.g., Arecibo Cmty. Health Care, Inc. v. Puerto Rico, 270 F.3d 17, 24-25 (1st Cir. 2001); Garcia, 280 F.3d at 113; Koslow, 302 F.3d at 172; Pederson, 213 F.3d at 875-76; Nihiser v. Ohio E.P.A., 269 F.3d 626, 628 (6th Cir. 2001); Stanley v. Litscher, 213 F.3d 340, 344 (7th Cir. 2000); Jim C., 235 F.3d at 1081; Douglas v. Cal. Dep't of Youth Auth., 271 F.3d 812, 819, as amended, 271 F.3d 910 (9th Cir. 2001); Robinson, 295 F.3d at 1189-90; Sandoval, 197 F.3d at 493.

### 4. Is Conditioning Acceptance of Federal Funds a Violation of the Unconstitutional-Conditions Doctrine?

Louisiana also attempts to invoke the "unconstitutional-conditions doctrine" to challenge Congress's ability to condition the acceptance of federal funds on waiver of Eleventh Amendment immunity. In the most general sense, the unconstitutional-conditions doctrine examines the extent to which government benefits may be conditioned or distributed in ways that burden constitutional rights or principles.[64] For at least two reasons, Louisiana's reliance on the unconstitutional-conditions doctrine is misplaced.

First, as evidenced by the dearth of cases employing it in this context,[65] the unconstitutional-conditions doctrine is most meaningful when the government imposes a condition of questionable constitutional character on an individual right. But here, federal and state sovereigns are on opposite sides of the controversy, and

---

[64] See Frost & Frost Trucking Co. v. Railroad Com. of Cal., 271 U.S. 583, 593-94 (1926) ("[T]he state ... may not impose conditions which require the relinquishment of constitutional rights.... It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.").

[65] The only Supreme Court decision that has come close was United States v. Butler. In that 1936 decision, the Court invalidated provisions of the Agricultural Adjustment Act of 1933, which paid farmers to reduce their production of crops. 297 U.S. at 74-78. As the Tenth Circuit has explained, though, "that case relied on an overly narrow view of Congress' enumerated powers to determine that Congress had overstepped its authority." Kansas v. United States, 214 F.3d 1196, 1201 n.6 (10th Cir. 2000) (citing LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 5-b, at 836 (3d ed. 2000) ("[T]he Supreme Court has effectively ignored Butler in judging the limits of congressional spending power.")). Accord Lipscomb, 299 F.3d at 319 (noting that the Supreme Court "quickly abandoned" the view espoused in Butler).

the constitutional "right" at issue is structural rather than personal. Consequently, for the reasons announced in the Third Circuit's analysis in Koslow v. Commonwealth of Pennsylvania, the doctrine is inapplicable. The Koslow court considered whether the Rehabilitation Act, including § 2000d-7, imposed an unconstitutional condition on Pennsylvania's receipt of federal funds. In refusing to apply the unconstitutional-conditions doctrine to the conditioning of federal funds on the waiver of Eleventh Amendment immunity, the Third Circuit stated:

> [T]he Supreme Court has not yet applied the "unconstitutional conditions" doctrine to cases between two sovereigns. Unlike private persons, states have the resources to serve their citizens even if the federal government, through economic incentives, encourages a particular result. A state's political powers——not the least of which is the power to levy taxes on its citizens——help ensure the federal government does not "coerce" the state through economic "encouragement." An individual citizen, in contrast, lacks these formidable institutional resources.[66]

We embrace that reasoning.

Second, the unconstitutional-conditions doctrine, even when applied piecemeal by the Supreme Court, is anchored at least in part in a theory of coercion or compulsion.[67] In this context, that

---

[66] 302 F.3d at 174 (citing Frost & Frost, 271 U.S. at 593; New York, 505 U.S. at 171-72; Dole, 483 U.S. at 210-11).

[67] See id. ("The "unconstitutional conditions" doctrine is based on the proposition that government incentives may be inherently coercive."). See also Kathleen M. Sullivan, Unconstitutional Conditions, 102 HARV. L. REV. 1415, 1428-55 (1989).

concern is subsumed in the non-coercion prong of the <u>Dole</u> test.[68] In other words, in the Spending Clause context, any role that the unconstitutional-conditions doctrine might have in cabining Congress's authority to give funds in exchange for waiving immunity is already part-and-parcel of the standard Spending Clause analysis. Thus, no independent constitutional bar invalidates Louisiana's waiver of Eleventh Amendment immunity.

## 5. Are These Programs Coercive?

In light of <u>Dole</u>, we must determine whether the conditional-spending schemes at issue are unduly coercive. We hold that they are not. A state can prevent suits against a particular agency under § 504 by declining federal funds for that agency.[69] A state can avoid suit under the IDEA merely by refusing IDEA funds. And, to do so in either case, the state would not have to refuse all federal assistance.[70] Moreover, no circuit has accepted a coercion challenge to either the Rehabilitation Act or the IDEA.[71] Therefore, we refuse to invalidate Louisiana's waiver on coercion grounds.

---

[68] <u>See</u> <u>supra</u> text accompanying note 24.

[69] <u>See</u> 29 U.S.C. § 794(b)(1).

[70] <u>See</u> 20 U.S.C. §§ 1411(a)(1), 1412, 1403.

[71] <u>See, e.g.</u>, <u>Jim C.</u>, 235 F.3d at 1082 (rejecting a coercion challenge to the validity of a waiver of state Eleventh Amendment immunity to § 504 claims).

D.    ABROGATION OF IMMUNITY

Alternatively, Pace asks this en banc court to rule that Congress — acting under § 5 of the Fourteenth Amendment — in fact abrogated Louisiana's Eleventh Amendment immunity, leaving Louisiana subject to suit on Pace's ADA, Rehabilitation Act, and IDEA claims.  As we hold that Louisiana waived its Eleventh Amendment immunity with respect to the Rehabilitation Act and the IDEA, it is not necessary for us to address Pace's contention that Louisiana's immunity to suit under those statutes was also abrogated.  Neither is it necessary for us to consider whether Title II of the ADA abrogates Eleventh Amendment immunity in this case.  First, the Supreme Court, in Tennessee v. Lane,[72] held that Title II abrogates sovereign immunity to the extent that it implicates the accessibility of judicial services, but refused to consider its application to other rights, including those considered to be fundamental under the Constitution.[73]  Because (1) the Supreme Court has never before recognized access to public education[74] or freedom from disability discrimination in education[75] to be fundamental rights, and (2) it is unnecessary to address

---

[72] 124 S. Ct. 1978 (2004).

[73] Id. at 1993.

[74] See Plyler v. Doe, 457 U.S. 202, 221, 223 (1982) (although important, education is not a fundamental constitutional right).

[75] Cf. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985) (disability classifications are subject only to rational-basis scrutiny).

Pace's Title II claims given that its rights and remedies are identical to and duplicative of those provided in § 504, we do not address whether the holding in Lane extends to disability discrimination in access to public education.

Second, when ADA claims are directed at architectural barriers, as they are here, the rights and remedies are exactly the same as those provided under the Rehabilitation Act. This circuit, as well as others, has noted that, because the rights and remedies under both statutes are the same, case law interpreting one statute can be applied to the other.[76] The implementing regulations for § 504 and Title II are, in all material respects, the same. For example, both statutes' implementing regulations prohibit similar

---

[76] See Hainze v. Richards, 207 F.3d 795, 799 (5th Cir. 2000) (internal citations omitted) ("The language of Title II generally tracks the language of Section 504 of the Rehabilitation Act of 1973, and Congress' intent was that Title II extend the protections of the Rehabilitation Act 'to cover all programs of state or local governments, regardless of the receipt of federal financial assistance' and that it 'work in the same manner as Section 504.' In fact, the statute specifically provides that '[t]he remedies, procedures and rights' available under Section 504 shall be the same as those available under Title II. Jurisprudence interpreting either section is applicable to both."); Washington v. Indiana High Sch. Athletic Ass'n, Inc., 181 F.3d 840, 845 n.6 (7th Cir. 1999) ("Title II of the ADA was modeled after § 504 of the Rehabilitation Act; the elements of claims under the two provisions are nearly identical, and precedent under one statute typically applies to the other."); Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998) ("The ADA has no federal funding requirement, but it is otherwise similar in substance to the Rehabilitation Act, and 'cases interpreting either are applicable and interchangeable.'"); McPherson v. Michigan High Sch. Ath. Ass'n, 119 F.3d 453, 459-60 (6th Cir. 1997) (en banc) (same).

types of discrimination.[77] In addition, § 504 and Title II's regulations governing new construction and alterations are effectively the same.[78] The two statutes are interpreted to provide the same exception: No covered entity is obligated to make a "fundamental alteration" in its programs.[79] Finally, the remedies available under § 504 and Title II are one and the same. Specifically, § 203 of Title II states that "[t]he remedies, procedures, and rights set forth in section 505 of the Rehabilitation Act of 1973 (29 U.S.C. 794a) shall be the remedies, procedures, and rights this title provides to any person alleging discrimination on the basis of disability in violation of section 202 [of the ADA]."[80] Section 505(a)(2) of the Rehabilitation Act, in turn, states that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964... shall be

---

[77] Compare 28 C.F.R. § 42.520, with 28 C.F.R. § 35.149. Similarly, § 504 and Title II's regulations regarding existing facilities are nearly identical. Compare 28 C.F.R. 42.521(a), with 28 C.F.R. 35.150(a).

[78] Compare 28 C.F.R. 42.522(a), with 28 C.F.R. 35.151(a).

[79] Compare Alexander v. Choate, 469 U.S. 287 (1995)(Section 504 does not require covered entities to make fundamental alterations in their programs); with 28 C.F.R. § 35.150(a)(2)-(3) (Title II does not require public entities to make fundamental alterations in the nature of a program, service, or activity). This requirement, however, does not excuse the failure to make altered or new facilities accessible. Compare 28 C.F.R. § 35.151(a)-(b), with 28 C.F.R. § 42.522(a).

[80] 42 U.S.C. § 12133.

available" for violations of § 504.[81] Thus, in <u>Barnes v. Gorman</u>,[82] the Supreme Court held that "the remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI" of the Civil Rights Act.[83] For all intents and purposes, therefore, the remedies available to Pace under § 504 and Title II are the same. The sole difference between the statutes lies in their causation requirements.[84] This difference is not implicated, however, where, as here, the challenge is to architectural barriers.

In conclusion, we hold that for all the foregoing reasons, Louisiana is not entitled to assert sovereign immunity under the Eleventh Amendment in this case. With that issue determined, we proceed to the question of issue preclusion.

### III. MERITS

We turn now to the merits of Pace's arguments that the district court erred in denying relief to him under the IDEA, the ADA and § 504.

---

[81] 29 U.S.C. § 794a(a)(2).

[82] 531 U.S. 181 (2002).

[83] <u>Id.</u> at 185.

[84] <u>See</u> <u>Soledad v. U.S. Dept. of Treasury</u>, 304 F.3d 500 (5th Cir. 2002).

A.    IDEA

We agree with and adopt that portion of the panel opinion affirming the district court's judgment which in turn affirmed the administrative determination that Pace was not entitled to relief under the IDEA.

We pause only to emphasize the somewhat unusual nature of a proceeding under the IDEA. As required by the statute,[85] Pace first pursued his administrative claim. He was granted a hearing by a hearing examiner where he had an opportunity to present his evidence demonstrating that the inaccessibility of various portions of the Bogalusa campus prevented him from receiving a free and appropriate public education (FAPE). The hearing examiner, after hearing the evidence and making a personal inspection of the campus, rejected Pace's inaccessibility claims and concluded that the defendants had complied with the IDEA and had provided a FAPE to Pace.[86] Pace then challenged the hearing examiner's findings and conclusion in his administrative appeal to the State Level Review Panel (SLRP). The SLRP also rejected Pace's claims and affirmed the hearing examiner in all respects.[87] Pace then filed suit in federal district court as authorized by 20 U.S.C. § 1415(i)(1)(A).

_____

[85] See 20 U.S.C. 1415(l).

[86] The hearing examiner thoroughly reviewed the testimony and physical evidence presented to her and rejected in wholesale fashion Pace's various claims of inaccessibility. R. 94.

[87] The language used by the SLRP also makes it clear that this review panel found absolutely no merit to Pace's inaccessibility claims. R. 64-65.

A district court in which such an action is filed must receive the record generated by the administrative proceeding and also hear additional evidence presented by the parties.[88] The court must then give "due weight" to the hearing officer's finding and make a de novo determination based on a preponderance of the evidence. Teague Independent School District v. Todd L, 999 F.2d 127, 131 (5th Cir. 1993). The district court considered all of Pace's claims of inaccessibility that he raised during the administrative proceedings.[89] The court considered the administrative record along with the new evidence offered by Pace and gave "due weight" to the findings of the hearing examiner and SLRP. Ultimately, the district court agreed with the hearing examiner that Bogalusa High School had provided Pace with a FAPE by complying with the IDEA in all

---

[88] See 20 U.S.C. § 1415 (i)(2) (A) (Any party aggrieved by the findings and decisions...shall have the right to bring a civil action with respect to the complaint pursuant to this section, which action may be brought...in a district court of the United States...).

[89] Pace sought relief from the district court to remedy the school board's refusal to make the following areas accessible:

- bathroom facilities
- classrooms on the second rather than first floor of the school
- elevator access
- exiting classroom during fire drills
- cafeteria
- school health center
- auditorium
- music room
- insufficient parking spaces
- lack of ramps (accessible entrances)

aspects, including that the campus was accessible to the wheelchair-bound Pace. The district court's conclusion is fully supported by the record and we therefore affirm the district court's rejection of Pace's claims under the IDEA.

B.   ADA AND SECTION 504

In addition to his IDEA claims, Pace also asserted claims under the ADA and § 504 in his suit. The district court severed the IDEA claims from these non-IDEA claims. After dismissing Pace's IDEA claims, the district court then considered defendants' motion for summary judgment seeking exoneration under § 504 and the ADA. The district court granted the defendants' motion for summary judgment on grounds that the factual bases for the non-IDEA claims were indistinct from the resolved IDEA claims. The district court concluded further that principles of issue preclusion applied to preclude Pace from pursuing his redundant non-IDEA claims. Pace argues that the district court committed legal error in applying principles of issue preclusion to bar his non-IDEA claims.

Issue preclusion or collateral estoppel is appropriate when: (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision. See Southmark Corp. v. Coopers & Lybrand (In re: Southmark Corp.), 163 F.3d 925, 932 (5th Cir. 1999). In Southmark we also found that the "relitigation of an issue is not precluded unless the facts and the legal standard used to assess them are the same in both proceedings." Id. (quoting

-34-

RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1281 (5th Cir. 1995)). Issues of fact are not "identical" or "the same," and therefore not preclusive, if the legal standards governing their resolution are "significantly different."[90] Pace argues that the accessibility issues the court litigated under the IDEA were for the limited purpose of determining whether the Bogalusa High School provided Pace with a FAPE under that statute. Thus, Pace contends, because a "significantly different" legal standard applies to his accessibility issues under the ADA and § 504, these latter claims were never litigated and issue preclusion should not apply. We therefore compare the standards of accessibility under the IDEA on the one hand and the ADA and § 504 on the other to determine whether the legal standards are "significantly different."

As indicated above, the IDEA requires states and local educational agencies receiving federal IDEA funds to make a FAPE available to children with certain disabilities between the ages of 3 and 21. The IDEA imposes extensive requirements on schools to safeguard the disabled child's right to a FAPE. 20 U.S.C. §§ 1414, 1415. In determining whether a school has provided a student with

---

[90] See, e.g., 18 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE 3d § 132.02[2][h] (3d ed. 2001). Courts have used slightly differing language to express this idea that legal issues are not "identical" for issue preclusion purposes if they are significantly different. Compare Raytech Corp. v. White, 54 F.3d 187, 191 (3d Cir. 1995) (the differences in the standards must be "substantial") with Talcott v. Allahabad Bank, Ltd., 444 F.2d 451, 460 (5th Cir. 1971) (the legal standards are not identical for issue preclusion purposes only when there is a "demonstrable difference" in the legal standards by which the facts are evaluated). For purposes of this appeal, these distinctions are irrelevant.

a FAPE, the focus is on the Individualized Education Plan (IEP), a written statement prepared by a team consisting of a representative of the local school district, the disabled child's teachers, the child's parents and the child. 20 U.S.C. § 1414(d). The IEP includes the child's educational performance, his goals, the nature of his disabilities, and a description of the educational and related services that will be provided for the child to meet the stated objectives. The objective is always to tailor the FAPE to the particular needs of the child. Cypress Fairbanks ISD v. Michael F., 118 F.3d 245, 247 (5th Cir. 1997).

The goal of the IDEA is to require a FAPE that will permit the child "to benefit" from the educational experience. It need not be the best possible education nor one that will maximize the child's educational potential. Bd. of Education v. Rowley, 458 U.S. 176 (1982).

Admittedly different from those underlying the IDEA, the Congressional objective of both the ADA and § 504 is the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1). Title II of the ADA, which applies to public entities including public schools, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. See also 28 C.F.R. § 35.130(a). Section 504 contains

virtually identical language.  See 29 U.S.C. § 784(a).  Mandating physical accessibility and the removal and amelioration of architectural barriers is an important purpose of each statute.[91]

The primary difference between the ADA and § 504 is that § 504 applies only to recipients of federal funds. 29 U.S.C. § 794(a). This difference does not concern us in this case because no defendant argues that it does not receive federal money.  Thus, as we stated in section II-D above, for the purposes of this appeal, the ADA and § 504 and their implementing regulations impose identical obligations on the defendants and grant identical rights to Pace.[92]

In Pace's brief to us on his non-IDEA claims brought under § 504 and the ADA he complains only that parts of the Bogalusa High School campus are inaccessible to him.  The only § 504 regulations dealing with accessibility in education are found in subpart C of the § 504 regulations. 34 C.F.R. §§ 104.21-104.23.  Section 104.23 of § 504's regulations deals with new construction on school campuses, the basis of Pace's complaints in this suit.  Subpart D of the § 504 regulations deals with preschool, elementary, and

---

[91] See 42 U.S.C. § 12101(a)(5) ("The Congress finds that ...individuals with disabilities continually encounter various forms of discrimination, including...the discriminatory effects of architectural...barriers,... failure to make modifications to existing facilities[,]...segregation, and relegation to lesser services, programs, [and] activities..."); Id. § 12101(a)(4) ("The Congress finds that...discrimination against individuals with disabilities persists in such critical areas as education..."); Alexander v. Choate, 469 U.S. 287, 297 (1985) (noting that the "elimination of architectural barriers was one of the central aims of the Rehabilitation Act").

[92] See note 78, supra.

secondary education and those regulations do not purport to cover accessibility in schools.[93] Rather, 34 C.F.R. § § 104.21-23, the general education regulations on accessibility found in subpart C of § 504 apply to new construction on high school campuses such as Bogalusa High.[94] The ADA has no specific section on education, so the general regulations governing accessibility to public buildings also control accessibility to school buildings.

With this background, we turn to Pace's specific argument that his accessibility claims under the ADA/504 are not precluded by the district court's rejection of his accessibility claims under the IDEA. He argues that his non-IDEA accessibility claims are not precluded because different legal standards apply to his ADA and § 504 accessibility claims, and these claims have never been litigated or decided. When we consider the equivalent standards for accessibility in schools under the IDEA on the one hand and the ADA/504 on the other, it becomes clear that we should reject this argument.

Congress required in a 1997 amendment to the IDEA that any

---

[93] Subpart D in the regulations to § 504 includes general regulations for preschool, elementary, and secondary education regarding placement (34 C.F.R. § 104.35), procedural requirements (34 C.F.R. § 104.36) and the general FAPE requirement (34 C.F.R. § 104.33).

[94] Although it is illogical to do so, one can read the § 504 regulations to say that a school need not comply with accessibility requirements in Subpart C to provide a § 504 FAPE under 104.33 when a student complains that part of a school's campus is inaccessible. In such a situation, it is more sensible to read these regulations as requiring a school's compliance with subpart C's accessibility requirements before it can be said to provide a § 504 FAPE. Regardless of whether the accessibility requirement s must be met before a § 504 FAPE is provided, subpart C of the § 504 regulations clearly requires new construction in the school to meet the regulation's accessibility requirements.

construction of new facilities must comply with either (1) The Americans with Disabilities Accessibility Guidelines for Buildings and Facilities (ADAAG); or (2) The Uniform Federal Accessibility Standards (UFAS). 20 U.S.C. § 1404(b).[95]  Thus, with respect to a physically disabled child such as the wheelchair-bound Pace, the school can comply with the IDEA's accessibility requirements by satisfying either the ADAAG or UFAS.[96]

Pace presents no argument that the accessibility standards for new construction of school buildings under the ADA or § 504 are more demanding or even different from the standards required under the 1997 amendment to the IDEA. This is understandable, because the regulations governing accessibility in schools under the ADA/504 require a school engaged in new construction to conform to the same standards as the IDEA, either the ADAAG or UFAS.

New construction and alterations of public facilities under

---

[95] 20 U.S.C. § 1404(b) provides in pertinent part:

> ...Any construction of new facilities or alteration of existing facilities under subsection (a) of this section shall comply with the requirements of–
>
> > (1) appendix A of part 36 of title 28, Code of Federal Regulations (commonly known as the "Americans with Disabilities Accessibility Guidelines for Buildings and Facilities"); or
> >
> > (2) appendix A of part 101-19.6 of title 41, Code of Federal Regulations (commonly known as the "Uniform Federal Accessibility Standards").

[96] The corresponding regulation to 20 U.S.C. § 1404 is found at 34 C.F.R. § 300.756 and is identical.

Title II of the ADA are governed by the regulations found in 28 C.F.R. § 35.151.[97] Like the IDEA, the ADA accessibility regulations require a school conducting new construction to comply with either the ADAAG or UFAS. Section 504's accessibility regulations are virtually identical to the ADA's,[98] and also demand that schools engaging in new construction comply with the same federal guidelines required by the IDEA. Thus, Pace's argument that the accessibility standards are different under IDEA and ADA/504 is meritless.

In summary, under the IDEA, when, as here, a child complains that his disability renders a portion of the campus inaccessible, this triggers the application of the 1997 amendments to the IDEA. In determining whether the school has met its obligations under the amendment and provided the disabled student with a FAPE, the hearing examiner, the SLRP, and the district court must determine whether the area of the school in question complies with either the ADAAG or UFAS. These are the same federal guidelines the school must comply with to satisfy the accessibility requirements of the ADA and § 504.

---

[97] 38 C.F.R. 35.151(c) provides in pertinent part:

(c) Accessibility standards. Design, construction, or alteration of facilities in conformance with the Uniform Federal Accessibility Standards (UFAS)...or with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG)...shall be deemed to comply with the requirements of this section with respect to those facilities...

[98] One minor difference between the accessibility regulations under § 504 and the ADA is that, because § 504 preceded the ADA and the ADA-specific accessibility regulations (ADAAG), § 504 does not give schools the option of complying with either the ADAAG or UFAS (as do both the ADA and IDEA), but requires compliance with the UFAS.

Pace, as he was required to do by the IDEA, presented his accessibility claims in his administrative claim. In their administrative findings, both the hearing examiner and the SLRP discussed the 1997 amendment to the IDEA. This makes it clear that both were aware that new or existing construction to Bogalusa High School must meet either the ADAAG or UFAS standards before the school could fully comply with the IDEA.[99]

The only significant summary judgment evidence Pace presented to the district court on his ADA/504 claims was the report and deposition testimony of Donald MaGinnis, an architectural expert. The point of his testimony is that structural changes to the Bogalusa campus failed to comply with the ADAAG. Although this same standard applied to Pace's claim under the IDEA, he did not introduce this evidence before the hearing examiner. Further, Pace failed to offer the expert evidence to the district court to support his appeal of the administrative determination under the IDEA. Because the accessibility standards under the IDEA and the ADA/504 are identical for new construction of school buildings, Pace has not demonstrated that the defendants owed him any greater or even

___

[99] Page five of the State Level Review Panel's opinion, under the heading "Applicable Law and Regulations," provides:

> Section 605 of the Individuals with Disabilities Education Act Amendments of 1997, states that any construction of new facilities or alteration of existing facilities with use of program funds shall comply with the requirements of Americans with Disabilities Accessibility Guidelines (Appendix A of Part 36 of Title 28, Code of Federal Regulations) or Uniform Federal Accessibility Standards (Appendix A of Part 101-19.6 of Title 41, Code of Federal Regulations). (R. 63).

different obligation in this respect under § 504/ADA than he was entitled to under the IDEA. Thus, the accessibility issue Pace litigated in his IDEA case and lost is the same issue he sought to litigate in his ADA/504 claim. The district court correctly concluded that Pace was precluded from relitigating this issue.

The only argument Pace presents to us on the applicability of the 1997 amendment was presented for the first time in his petition for en banc review. He argued in that petition and argues to the en banc court that the amendment was not triggered because no evidence was presented that "IDEA funds" were used to make the improvements to the Bogalusa campus. Pace relies on the following language in the 1997 amendment to 20 U.S.C. § 1404:

> **§ 1404.    Acquisition of equipment; construction or alteration of facilities**
> (a)  In general
>
> If the Secretary determines that a program authorized under this chapter would be improved by permitting program funds to be used to acquire appropriate equipment, or to construct new facilities or alter existing facilities, the Secretary is authorized to allow the use of those funds for those purposes.

Neither the amendment nor the existing statute purports to require a plaintiff to prove the use of IDEA funds or any other fact as a predicate to seeking relief under the IDEA against a school for failing to make its campus accessible in response to a student's IEP. We have found no cases interpreting this amendment or its predecessor. Subsection (a) is simply a restyled version of the

existing statute.[100]  The change is found in Subsection (b), which incorporates into the IDEA for the first time the ADAAG and UFAS construction standards.  The amended § 1404(a), like the existing statute, authorizes the Secretary to allow the use of IDEA funds for construction or alterations.

To support Pace's argument that the amended version of § 1404 does not apply in this case, amicus seems to argue that structural alterations to meet accessibility demands in a student's IEP are not part of the calculus in determining whether a student has received a FAPE.

In Weber's <u>Special Education Law and Litigation Treatise</u>, he rejects this suggestion in his cogent discussion of the interplay between the IDEA, § 504 and ADA:

> Schools covered by Title II and Section 504 owe obligations not only to students with disabilities but to all persons with disabilities whom they serve.  In this sense, the laws are more inclusive than the Individuals with Disabilities Education Act (IDEA), whose beneficiaries are children with disabilities who need special education.  Nevertheless, by requiring school districts to provide an appropriate education in the least restrictive environment, IDEA overlaps with Section 504 and Title II in terms of the children it covers. <u>Thus, IDEA may require a school district to modify programs or facilities to achieve these ends for an</u>

---

[100] The pre-amended version of 20 U.S.C. 1404(a) provided as follows:
(a) Authorization for use of funds

> In the case of any program authorized by this chapter, if the Secretary determines that such program will be improved by permitting the funds authorized for such program to be used for the acquisition of equipment and the construction of necessary facilities, the Secretary may authorize the use of such funds for such purposes. (West 1996).

individual student.  IDEA funds may be used for removal of architectural barriers or other improvements to accessibility in order to promote appropriate education for children with disabilities.(Footnotes omitted)[101] (emphasis added)

Weber further describes a school's duty under the IDEA to address accessibility concerns in the IEP as "a component of appropriate special education and related services in the least restrictive environment."[102]  This discussion makes it clear that when a student's IEP raises concerns of accessibility to the school's campus, the determination of whether these concerns have been met is a necessary component in resolving whether the student has received a FAPE.

The Hearing Examiner tried this controversy on the premise that the entire IDEA statute, including the 1997 amendment, applied to Pace's claims, and no one argued to the contrary.  The Hearing Examiner did not require the parties to file extensive pre-trial papers.  However, she did require each party to list the issues they wanted the hearing examiner to address.  Neither Pace nor the school board asserted that an issue was presented with respect to the expenditure of IDEA funds or any other issue relating to the applicability of the 1997 amendment to § 1404.  Considering the strict duty that the ADAAG and UFAS construction guidelines impose

---

[101] MARK C. WEBER, SPECIAL EDUCATION LAW AND LITIGATION TREATISE 7.1 (2D ED. 2002).

[102] Weber, note 3 at 7.2. (Footnotes omitted).  Weber concludes that "modifications [to the campus] may include wheelchair ramps, handrails, accessible toilets, and water fountains."

on the school, it was also reasonable for the Hearing Examiner to assume that the school board would object if there was some basis for it to argue that these guidelines did not apply to the architectural improvements ordered by Pace's IEP. It is not surprising that Pace did not object to the Hearing Examiner's application of such rigorous standards; it was in his interest at the time to require the school to meet the toughest standards possible in making the architectural improvements.

After three hearings, the Hearing Examiner issued her report finding that Bogalusa High had provided Pace with a FAPE. The Hearing Examiner explicitly found that the ADAAG guidelines applied, meaning that she concluded that Pace's accessibility concerns regarding improvements made to the campus triggered the application of the 1997 amendment to § 1404 of the IDEA. Otherwise, the ADAAG guidelines would be irrelevant. In making her findings, the Hearing Examiner relied on the voluminous administrative record, which shows that Bogalusa received substantial federal IDEA funds during 1996 and 1997, the relevant time period.[103] IDEA regulations make it clear that federal IDEA funds cannot be co-mingled with state funds.[104] The Hearing examiner also had the benefit of Pace's IEP and the testimony of the School Board's Maintenance Supervisor that

---

[103] For the 1996-97 fiscal year, the record shows that Bogalusa was the recipient of $164,213 in federal funds for its "Special Education" program.

[104] 34 CFR § 300.152.

the construction changes were made in response to Pace's IEP facilitator's instructions. Even if a showing of the use of IDEA funds was required, it was reasonable for the Hearing Examiner to conclude that IDEA funds were used and that under the amended version of 20 U.S.C. § 1404 the school provided Pace with a FAPE.

Pace appealed the Hearing Examiner's order to the State Level Review Panel (SLRP). Again, the record reflects no argument from any party to that appeal that the entire IDEA statute, including the 1997 amendment to § 1404, did not apply. The SLRP in its opinion explicitly applied the 1997 amendment, discussed Pace's arguments, and after rejecting them, affirmed the Hearing Examiner.

Pace then filed suit in federal district court seeking relief under the IDEA, §504 and the ADA. He specifically alleged in his petition that the state received federal IDEA funds.[105] His core claim was that the school had failed to comply with the ADAAG.

The primary evidence Pace presented to the district court was the deposition testimony and report of architect Donald MaGinnis, who testified that the structural changes to the campus failed to meet ADAAG standards. Thus, Pace's federal claim was predicated on these guidelines, made applicable to the IDEA by the 1997 amendment to § 1404. Because the Hearing Examiner and the SLRP had rejected Pace's accessibility claims based on application of these same standards (the ADAAG and UFAS), the district court concluded that

---

[105] R. 192.

Pace was precluded from relitigating his accessibility issues.

Suffering summary judgment in the district court on both his IDEA and non-IDEA claims, Pace sought appellate relief from this court. In his initial brief to the panel, Pace argued that the district court erred in accepting the Hearing Examiner and SLRP's findings of accessibility to preclude his non-IDEA accessibility claims. However, Pace did not base his argument on the inapplicability of the 1997 amendment to § 1404 or that the Hearing Examiner erred in applying the ADAAG guidelines to the structural changes. The School Board did argue to the panel that the amendment applied and that the Hearing Examiner and SLRP had used the very same federal guidelines in deciding Pace's IDEA claims that Pace sought to litigate in his non-IDEA action.[106]

Faced with the appellee's argument that his non-IDEA claims were precluded due to the previous application of the 1997 amended version of § 1404, Pace filed a reply brief with the panel. Again, he made no effort to refute the School Board's argument that the 1997 amendment to § 1404 applied.

Without any opposition from Pace as to the proper application of § 1404 to the improvements to Bogalusa High's campus, the panel accepted the School Board's unchallenged argument and relied on the

---

[106] Appellee Bogalusa City School Board's Brief at 32.

1997 amendment to affirm the district court's judgment.[107] The panel specifically cited the 1997 amended version of § 1404 to support its conclusion that issue preclusion was proper because accessibility to the campus had already been litigated under the same federal standards.[108]

In response to the panel's decision, Pace sought en banc review, where he argued for the first time that § 1404 did not apply to the improvements he demanded in his IEP, because "[t]here is no proof that construction in this case would be covered by this provision."[109]

In sum, we do not read the 1997 amendment to require proof that IDEA funds were used for improvements to trigger the amendment. Even if the statute can be read in this manner, there is evidence to support an inference that IDEA funds were used to make the structural changes. More importantly, we cannot permit Pace to change his position at will. He was obviously happy to have the administrative bodies and the trial court apply the 1997 amendment to § 1404 (and the strict ADAAG guidelines) when it was helpful to him. He cannot at this late date reverse his position when he finds that application of those guidelines are not in his best interest.

---

[107] Pace v. Bogalusa City School Bd., 325 F.3d 609 (5th Cir. 2003).

[108] Id. at 614.

[109] Appellant Travis Pace's En Banc Brief at 22.

Pace has one remaining argument in support of his position that issue preclusion should not apply to his claims under the ADA and § 504. He argues that the IDEA's "savings clause," gives him the right to maintain a cause of action under the ADA and § 504.[110] We agree that Pace is not limited to a claim under the IDEA and that he can assert claims under the ADA and § 504. But his ability to assert non-IDEA claims does not mean that general principles of issue preclusion do not apply to preclude his redundant claims.[111] Because Pace's claims under the ADA and § 504 are factually and legally indistinct from his IDEA claims, issue preclusion is proper in this case.

Because Pace is precluded from litigating the question of whether the defendants have any obligation under the ADA and § 504 to make further architectural or structural changes in the buildings on the Bogalusa campus, his claim for an injunction ordering such changes must also fail.

---

[110] The IDEA's "savings clause" is found in 20 U.S.C 1415(l), and provides in pertinent part:
> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies under...the Americans with Disabilities Act of 1990...title V of the Rehabilitation Act of 1973...or other Federal laws protecting the rights of children with disabilities...

[111] See, e.g., Burlovich v. Bd. of Educ., 208 F.3d 560 (6th Cir. 2000) (issue preclusion may apply to redundant ADA and § 504 claims), Indep. Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 562 (8th Cir. 1996) (principles of issue preclusion and claim preclusion may properly be applied to short-circuited redundant claims under other laws) and Urban v. Jefferson County Sch. Dist. R-1, 89 F.3d 720, 728 (10th Cir. 1996) (issue preclusion proper to dismiss § 504 placement claim when identical issue already litigated under the IDEA).

In conclusion, we AFFIRM the district court's dismissal of Pace's claims under the IDEA and also AFFIRM the district court's dismissal of Pace's claims for damages and injunctive relief under the ADA and § 504.

ENDRECORD

EDITH H. JONES, Circuit Judge, with whom JOLLY, SMITH, BARKSDALE, GARZA AND DeMOSS, Circuit Judges, join, concurring in part and dissenting in part:

I concur in the court's discussion of the merits of Pace's claims, but I respectfully dissent from the majority's conclusion that the State of Louisiana, by accepting federal education funds from 1996 to 1998 (the period here at issue), validly waived its Eleventh Amendment immunity from suit for violations of § 504 and the IDEA statute. Instead, we should hold that under these limited and unusual circumstances, the State did not knowingly waive its constitutional right to be free from suit by private citizens.[112]

Alexander Hamilton wrote:

It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every state in the Union.

THE FEDERALIST NO. 81, at 487-88 (Clint Rossiter ed., 1961). The Eleventh Amendment protects States from suit in federal court precisely out of the recognition of their continued status as co-sovereigns. Puerto Rico Aqueduct & Sewer Auth. v. Metcalf &

_____

[112] The panel opinion observed that the State's victory in this case would be Pyrrhic because only during a three-year period could the panel conclude that the State did not "knowingly" waive its Eleventh Amendment immunity. The majority apparently believe that a Pyrrhic victory is one too many.

<u>Eddy, Inc.</u>, 506 U.S. 139, 146, 113 S. Ct. 684, 689 (1993). For over one hundred years, the Supreme Court has "extended a State's [constitutional] protection from suit to suits brought by the State's own citizens." <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261, 267-68, 117 S. Ct. 2028, 2033 (1997) (referring to <u>Hans v. Louisiana</u>, 134 U.S. 1, 10 S. Ct. 504 (1890)).

There are two carefully construed exceptions whereby States may become subject to suits by private citizens. Congress may abrogate state sovereign immunity pursuant to § 5 of the Fourteenth Amendment, or the State may waive its sovereign immunity and give its consent to suit. <u>See</u> <u>Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 670, 119 S. Ct. 2219, 2223 (1999)). However, "[b]ecause abrogation of sovereign immunity upsets the fundamental constitutional balance between the Federal Government and the States, . . . and because States are unable directly to remedy a judicial misapprehension of that abrogation, the Court has adopted a particularly strict standard to evaluate claims that Congress has abrogated the States' sovereign immunity." <u>Port Auth. Trans-Hudson Corp. v. Feeney</u>, 495 U.S. 299, 305, 110 S. Ct. 1868, 1872 (1990) (citations and quotations omitted). "Similar solicitude for States' sovereign immunity underlies the standard that this Court employs to determine whether a State has waived that immunity." <u>Id.</u>

Travis Pace advances both abrogation and waiver theories in support of his claims against Louisiana. The majority agrees

with Pace that Louisiana waived its sovereign immunity as a condition of accepting federal funds under § 504 of the Rehabilitation Act and IDEA. In so doing, the majority has forsaken the "particularly strict standard" the Eleventh Amendment demands, ignored the Supreme Court's settled test for evaluating a waiver of constitutional rights, and inexplicably discounted the unique factual context from which this case arose.

## I.  WAIVER

As a fundamental constitutional component, "[s]tate sovereign immunity, no less than the right to trial by jury in criminal cases, is constitutionally protected." <u>Coll. Sav. Bank</u>, 527 U.S. at 682, 119 S. Ct. at 2229. The same test used in evaluating waiver of other fundamental constitutional rights must be employed in the Eleventh Amendment context as well. As the Court held, there is no justification for creating a separate and distinct test for Eleventh Amendment waiver purposes. Thus, "[t]he classic description of an effective waiver of a constitutional right is the intentional relinquishment or abandonment of a <u>known</u> right or privilege." <u>Id.</u> (citations and quotations omitted) (emphasis added). According to the sole applicable test, therefore, "waiver must have been made with a full awareness of both the <u>nature of the right</u> being abandoned and the <u>consequences</u> of the decision to abandon it." <u>Moran v. Burbine</u>, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986) (emphasis added). Moreover, "courts indulge every reasonable presumption against waiver of fundamental constitutional rights and

-53-

. . . do not presume acquiescence in the loss of fundamental rights." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938). This circuit, at least until today, adhered to this uniform approach. "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences[.]" United States v. Newell, 315 F.3d 510, 519 (5th Cir. 2002)(quoting Brady v. United States, 397 U.S. 742, 748, 90 S. Ct. 1463 (1970)) (emphasis added). A valid waiver requires "actual knowledge of the existence of the right or privilege, full understanding of its meaning, and clear comprehension of the consequences of the waiver." Id. (quoting Hatfield v. Scott, 306 F.3d 223, 230 (5th Cir. 2002)) (emphasis in original).

The test for a State's waiver of Eleventh Amendment immunity is no different because Congress sought to effect waiver under the Spending Clause. The Supreme Court "has repeatedly characterized . . . Spending Clause legislation as 'much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" Barnes v. Gorman, 536 U.S. 181, 186 (2002) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981)). "Just as a valid contract requires offer and acceptance of its terms, the legitimacy of Congress' power to legislate under the spending power . . . rests on whether the [recipient] voluntarily and knowingly accepts the terms of the contract." Barnes, 536 U.S. at 186 (citations and

quotations omitted) (emphasis added); see also Pennhurst, 465 U.S. at 99, 104 S. Ct. at 907 (the State's consent to suit must be "unequivocally expressed").  As a result, the "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one."  Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241, 105 S. Ct. 3142, 3146 (1985).

Despite this clear authority, the majority has crafted a novel waiver test for Spending Clause cases.  Relying on South Dakota v. Dole, 483 U.S. 203, 107 S. Ct. 2793 (1987), the majority draws two conclusions: (1) a State's waiver is knowing so long as Congress satisfies the "clear statement rule," and (2) the State's waiver is voluntary so long as it is "non-coercive."  Although I agree with the latter conclusion, the former is incorrect.[113]

---

[113]  Dole's "non-coercive" requirement is a satisfactory proxy for the "voluntariness" prong of the waiver inquiry.  Thus, under the current state of the law, § 2000d-7(a) is not unconstitutionally coercive.  As a result, the State of Louisiana acted voluntarily for purposes of the constitutional waiver test. But, with due regard for precedent, I am compelled to raise the following question: "If not now, and on this showing, when, and on what showing" will federal grants be deemed unconstitutionally coercive? Cf. Spangler v. Pasadena City Bd. of Ed., 611 F.2d 1239, 1240 (9th Cir. 1979).  The Rehabilitation Act, pursuant to 29 U.S.C. § 794(a), requires non-consenting States to forfeit all federal funds.  For the Louisiana Department of Education, renouncing all federal funds would cut its budget by $804,269,621, or 75%.  Dole counseled that "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion."  483 U.S. at 211 (emphasis added).  To date, the Supreme Court has not found a case that warranted vindication of this principle.  Nevertheless, Louisiana and its children would suffer extreme consequences here if the State were to lose massive federal assistance by asserting its constitutional right to sovereign immunity.

College Savings Bank controls the Eleventh Amendment waiver inquiry and demands more than a congressional "clear statement" — it also requires the State to make a "clear declaration" of its intent to waive its immunity. In College Savings Bank, the Supreme Court recognized that for a State "knowingly" to waive its sovereign immunity, not only must Congress make clear its intention to so condition federal funds, but the State must expressly and unequivocally waive its immunity. "There is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have that immunity." Coll. Sav. Bank, 527 U.S. at 680-81, 119 S. Ct. at 2228. "In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals." Id.

Despite the majority's assertion to the contrary, College Savings Bank confirms that Dole's "clear statement" requirement is only half of the waiver equation. See Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn, 280 F.3d 98, 113-14 (2d Cir. 2001) (concluding that "a clear expression of Congress's intent . . . alone is not sufficient . . . to find that [the State] actually waived its sovereign immunity by accepting federal funds"). "The whole point of requiring a 'clear declaration' by the State of its waiver is to be certain that the State in fact consents to suit." Coll. Sav. Bank, 527 U.S. at 680, 119 S. Ct. at 2228 (emphasis in

-56-

original).  "Whether Congress clearly required that a State waive its immunity before accepting federal funds (the first inquiry) is not the same thing, however, as whether the State clearly declared its knowing waiver (the second inquiry)."  Douglas v. Cal. Dep't of Youth Auth., 285 F.3d 1226, 1228 (O'Scannlain, J., dissenting from denial of petition for rehearing en banc)(emphasis in original).  "The mere receipt of federal funds cannot establish that a State has consented to suit in federal court."  Atascadero, 473 U.S. at 246-47.[114]

For a State to evince its "clear declaration" of intent to waive sovereign immunity, it must possess "actual knowledge of the existence of the right or privilege, full understanding of its meaning, and clear comprehension of the consequences of the waiver."  Newell, 315 F.3d at 519 (citations and quotations omitted) (emphasis in original).  In all but the rarest of circumstances, acceptance of federal funds offered in accordance with the "clear statement rule" will meet this test.  This case represents an exception to the general rule.

The majority ignores the fact that until the mid-1990's, it was assumed that Congress could abrogate state sovereign immunity in legislation enacted pursuant to its Article I enumerated powers.  The Supreme Court held otherwise in Seminole Tribe v. Florida, 517

---

[114]     Furthermore, the majority's reliance on the precedents of other circuits is unpersuasive.  Those circuits, like our court today, focused exclusively on whether Congress clearly expressed its intention to condition acceptance of federal funds on waiver of immunity — not whether the State reasonably believed it was waiving immunity by accepting federal funds.

U.S. 44, 72-73, 116 S. Ct. 1114 (1996), while reaffirming that abrogation remained permissible through a proper exercise of power under § 5 of the Fourteenth Amendment. Id. at 59, 116 S. Ct. 1114. In the statutes here at issue — ADA, § 504 and IDEA — abrogation was enacted under the Commerce Clause. Since, however, all three statutes enhance the rights of the disabled, and all three express a clear congressional intent to abridge the States' Eleventh Amendment immunity, federal courts routinely permitted suits by private individuals to proceed against the States. As late as 1998, while applying the Supreme Court's narrow construction of the § 5 abrogation authority,[115] this court still held that the ADA validly abrogated state sovereign immunity. Coolbaugh v. Louisiana, 136 F.3d 430 (5th Cir. 1998), cert. denied, 525 U.S. 819, 119 S. Ct. 58 (1998) overruled by Reickenbacker v. Flores, 274 F.3d 974 (5th Cir. 2001).[116]

Surely Louisiana should not be penalized for construing the ADA — and counterpart abrogation language in § 504 and IDEA — just as this court subsequently did in Coolbaugh. Instead, the State acted quite rationally in assuming between 1996 and 1998 that

---

[115]   See City of Boerne v. Flores, 521 U.S. 507, 117 S. Ct. 2157 (1997).

[116]   Reickenbacker's holding flows from the Supreme Court's decision in Bd. of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. 356, 368, 121 S. Ct. 955, 964 (2001), which held that Title I of the ADA did not validly abrogate state sovereign immunity pursuant to § 5 of the Fourteenth Amendment. Because Title II of the ADA and § 504 of the Rehabilitation Act offer virtually identical protections, the abrogation analysis with regard to the two statutes is the same. Reickenbacker, 274 F.3d at 977 n. 17; see also Garcia, 280 F.3d at 114; Hoekstra v. Indep. Sch. Dist., 103 F.3d 624, 626 (8th Cir. 1996).

it had no sovereign immunity to waive when it accepted federal education funds under conditions specified by § 504 and IDEA. The State voluntarily accepted federal funds, but its acceptance was not a "knowing" waiver of immunity. As the Second Circuit put it, since "the proscriptions of Title II [of the ADA] and § 504 are virtually identical, a State accepting federal funds could not have understood that in doing so it was actually abandoning its sovereign immunity from private damage suits, since by all reasonable appearances state sovereign immunity had already been lost." Garcia, 280 F.3d at 114 (citations omitted).[117]

The majority offers two principal arguments against this result. First, the majority conflates abrogation and waiver when positing that "Louisiana did have Eleventh Amendment immunity to waive by accepting the clearly conditioned federal funds." See Majority Op. at 21 (emphasis in original). On the contrary, Coolbaugh confirmed, until Garrett and Reickenbacker overruled it, that Congress had validly exercised its abrogation authority, rendering Louisiana amenable to suit notwithstanding the Eleventh Amendment. The majority's suggestion that Congress can abrogate sovereign immunity, but still permit the States to retain their

---

[117] Conversely, after Garrett was decided, the State defendants could knowingly waive their immunity because they could have reasonably anticipated the ability to preserve sovereign immunity by declining federal funds under the Rehabilitation Act and the IDEA. See Bd. of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. 356, 121 S. Ct. 955 (2001) (invalidating an abrogation of Eleventh Amendment immunity pursuant to Title I of ADA).

-59-

Eleventh Amendment immunity, misapprehends the import of abrogation.[118]

Still, Congress may, in its discretion, choose to trigger enforcement of any federal statute, even after it has abrogated sovereign immunity, on the receipt of federal funds. In response, a State, by refusing federal funds, may reject the terms of the "contract" and potentially avoid statutory liability to private individuals. But whether it can avoid liability based upon a contractual/waiver theory is a different question from whether it retained Eleventh Amendment sovereign immunity post-abrogation.[119] Thus, the relevant Eleventh Amendment inquiry remains whether Louisiana reasonably believed, based on objective evidence, that the Rehabilitation Act and the IDEA validly abrogated its sovereign immunity — not whether it could have chosen to reject the federal funds anyway.

Second, the majority contends that requiring the State to

---

[118] The unmistakable difference between abrogation and waiver is complicated by statutes, like § 2000d-7(a), that attempt to achieve both in the same provision. Nevertheless, the circuit courts and the panel opinion here agree that statutory language may, in fact, constitute both an attempted abrogation and conditional waiver provision. See, e.g., Stanley v. Litscher, 213 F.3d 340, 344 (7th Cir. 2000); Robinson v. Kansas, 295 F.3d 1183, 1189-90 (10th Cir. 2002). However, a statute's capacity to serve dual purpo ses does not justify the majority's confusion of the two concepts.

[119] The majority implies that Louisiana's self-interested acceptance of funds should prevent the State from arguing that it might have chosen to forego the funds for the sake of maintaining sovereign immunity. Louisiana's mistaken (though eminently reasonable) belief that abrogation had occurred distorted this calculation, however. That the State does have immunity to waive now throws into high relief the potential coercion inherent in the federal government's funding condition. The "cost" of Louisiana's resting on its constitutional right is over $800 million annually!

make a "clear declaration" problematically "engraft[s] a subjective-intent element onto an otherwise objective Spending Clause waiver inquiry." See Majority Op. at 22. Unfortunately, the majority misunderstands the nature of the "clear declaration" requirement, a requirement consonant with the Supreme Court's longstanding objective approach to waiver. The Supreme Court uniformly applies a "totality of the circumstances" test to waiver questions involving fundamental constitutional rights. Fare v. Michael C., 442 U.S. 707, 725, 99 S. Ct. 2560, 2572 (1979). "Only if the totality of the circumstances . . . reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the . . . rights have been waived." See Burbine, 475 U.S. at 421, 106 S. Ct. at 1135. Hence, the Supreme Court considers a variety of objective factors, not subjective intent, to determine whether a constitutional right has validly been waived. Fare, 442 U.S. at 725, 99 S. Ct. at 2572; see also United States v. Sonderup, 639 F.2d 294, 298 (5th Cir. 1981) (relying on the objective indicia to determine whether a voluntary, knowing and intelligent waiver was made). College Savings Bank's "clear declaration" requirement reiterates the Supreme Court's waiver test in the Eleventh Amendment context, and so would I.[120]

---

[120]    The majority's approach unquestionably achieves a bright-line rule that the Supreme Court's traditional waiver inquiry cannot. However, this approach is impermissible in the context of waiver of fundamental constitutional rights.

An express written statement of waiver of the right to remain silent or the right to

-61-

Given this court's ruling in <u>Coolbaugh</u> that the State had no immunity to waive, followed by an unsuccessful en banc poll and the Supreme Court's denial of <u>certiorari</u> in that case, it is inconceivable that Louisiana somehow, based on the "straightforward objective facts," knowingly chose to waive a right that was non-existent when it acted. In a sense, the State of Louisiana is being forced, by today's majority, to bear the burden of this court's mistake of law in <u>Coolbaugh</u>. Consider this analogy: the police instruct a criminal defendant, "for his own good," to sign a waiver of counsel form, while telling him that the waiver is "meaningless, because you have no counsel rights to waive." Who would argue that the waiver is knowing, especially if the police showed him a court decision confirming this view? That the dupe is an individual defendant rather than the State does not, per <u>College Savings</u>, make this a different case, nor does the fact that the waiver falls under the Spending Clause rather than some other type of enactment. The majority's opinion violates <u>College Savings Bank</u>.

In this rare instance, Louisiana could not have knowingly waived its sovereign immunity in the relevant time period before the <u>Garrett</u> decision. The majority's approach strangely counsels States

---

counsel is usually strong proof of the validity of that waiver, but it is not inevitably either necessary or sufficient to establish waiver. <u>The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights</u> delineated in the <u>Miranda</u> case.

<u>North Carolina v. Butler</u>, 441 U.S. 369, 374, 99 S. Ct. 1755, 1758 (1979).

to disregard governing caselaw when Supreme Court doctrine is evolving.  Such an argument makes no more sense in this unusual context than it would in any other.

## II.  ABROGATION

Pace alternatively argues, and this dissent must determine, whether Congress abrogated Louisiana's sovereign immunity with respect to claims brought under Title II, § 504, and the IDEA. Pace would extend the Court's recent decision in Tennessee v. Lane, 541 U.S. 509, 124 S. Ct. 1978 (2004), which held that Title II of the ADA validly abrogates State sovereign immunity insofar as it implicates the physical accessibility of the fundamental constitutional right of access to the courts.  The majority here, having found a waiver of the State's immunity, declares it unnecessary to opine on abrogation.  The majority goes on, however, to observe that, in Lane, the Supreme Court "refused to consider [whether Title II abrogates] other rights, including those considered to be fundamental under the Constitution."  See Majority Op. at 28, citing 124 S. Ct. at 1993.  The majority also comments that the Court "has never before recognized access to public education or freedom from disability discrimination in education as fundamental rights."  Id., citing Plyler v. Doe, 457 U.S. 202, 221, 223, 102 S. Ct. 2382, 2396-98 (1982); City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446, 105 S. Ct. 3249, 3257 (1985).

I agree with the majority's dicta that suggests Lane is currently of limited application.  Moreover, because Lane was

-63-

written very narrowly, I conclude that this court's decision in Reickenbacker remains valid in holding that ADA Title II, apart from the Lane scenario, does not validly abrogate States' Eleventh Amendment immunity. See Reickenbacker, 274 F.3d at 983. The fate of § 504 abrogation was also sealed in Reickenbacker based on the court's conclusion that Title II and § 504 impose "virtually identical" obligations. Id. For the reasons stated in Reickenbacker and in the panel opinion, I would hold that Congress could not constitutionally abrogate state sovereign immunity in § 504 or the similarly structured IDEA statute pursuant to § 5 of the Fourteenth Amendment. The remedies imposed by those laws "far exceed [ ] [those] imposed by the Constitution, and [I] cannot conclude that they are congruent and proportional to the legislative findings of unconstitutional discrimination against the disabled by the states." Reickenbacker, 274 F.3d at 983.

### III.  CONCLUSION

For the foregoing reasons, I conclude that during a narrow period of time, based on uncertainty in the Supreme Court's evolving Eleventh Amendment doctrine, the State of Louisiana did not knowingly waive its Eleventh Amendment sovereign immunity when it accepted federal funds under § 2000d-7(a).

I respectfully dissent.